1
2
3
4
5
6         IN THE UNITED STATES DISTRICT COURT
7       FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9    JAMES A. PETTAWAY,                    )
                                           )
10            Petitioner,                  )    No. C 04-2708 CRB (PR)
                                           )
11       v.                                )    ORDER DENYING PETITION
                                           )    FOR A WRIT OF HABEAS
12   DAVID L. RUNNELS, Warden,             )    CORPUS
                                           )
13            Respondent.                  )
     ─────────────────────────────────    )
14
15
16          Petitioner was convicted of robbery by a jury in the Superior Court of the
17   State of California in and for the County of Alameda.  In addition, the court -
     petitioner having previously waived jury trial - found true that petitioner had
18   suffered prior convictions for robbery and attempted murder.  On February 5,
19   2001, petitioner was sentenced to 35 years to life in state prison.
20          The California Court of Appeal affirmed petitioner's conviction and
21   sentence, and the Supreme Court of California denied review.
22          On July 8, 2004, petitioner filed the instant petition for a writ of habeas
23   corpus under 28 U.S.C. § 2254.  Per order filed on October 26, 2004, the court
24   found that the petition, when liberally construed, stated cognizable claims under §
25   2254 and ordered respondent to show cause why a writ of habeas corpus should not
26   be granted.  Respondent has filed an answer to the order to show cause and
27   petitioner has filed a traverse.
28

**FACTUAL BACKGROUND**

The California Court of Appeal summarized the facts of the case as follows:

Paulina Hoang was working as [] a teller at Alameda Bank in Hayward on March 4, 1997. At approximately 2:50 p.m., [petitioner] came up to Hoang's window and gave her a slip of paper that said: "No alarm. No dye pack. Nobody gets hurt. Give me the money." [Petitioner] said nothing to Hoang when he gave her the note, but he did smile. She made a point of looking at him so she could remember what he looked like. He had an overbite with white teeth, and also had a mustache. He wore a long-sleeved black T-shirt with a circle on it and writing around the circle that said "San Leandro" and a round cotton fishing hat. Hoang gave [petitioner] the money in her drawer as well as "bait money," which contained a tracking device between two bills. She gave him approximately $1,200.

[Petitioner] then left the bank and Hoang immediately activated the alarm and wrote down a description of [petitioner] and the incident. She also alerted her supervisor, Joan Pine. A police officer arrived within a couple of minutes. About 20 minutes later an officer took Hoang to view a person being held in front of the Hayward Library, about two blocks away. From about eight to ten feet away, Hoang identified [petitioner] as the robber, saying she was 100 percent certain it was him. He had on a jacket and it looked like he had turned his shirt inside out. At trial, she was still certain [petitioner] was the robber.

On March 4, 1997, Joan Pine was operations manager for Alameda Bank in Hayward. That day at about 2:53 p.m., teller Paulina Hoang told Pine that she had just been robbed. Pine put a plastic sheet over Hoang's teller window to protect evidence, and provided a listing of the bait money and the surveillance tape when police arrived. Laura West was a teller supervisor at the bank. She conducted an audit of Hoang's drawer after the robbery and found that about $2,000 was missing.

Bank customer Jose Valle stood in line behind the robber. The man was wearing a tan fisherman's hat and a dark sweatshirt. He saw the man approach a teller, pull out a checkbook, take out a piece of paper, and hand it to the teller. The man leaned over the counter and got very close to the teller. He then pulled back a bit, and raised and lowered his shirt. The teller then handed the man something, he grabbed it, and walked out of the bank. Based on the man's movements, Valle believed he was robbing the bank. About 20 minutes after the robbery, Valle was taken to the Hayward library to look at a possible suspect. Valle was certain that the man he saw was the robber. At trial, Valle could not identify [petitioner] as the robber. [Petitioner] looked heavier and had a beard and longer hair than the man he remembered.

Hayward police officer Fraser Ritchie was on patrol when he was dispatched to Alameda Bank at about 2:50 p.m. on March 4, 1997. Teller Hoang gave him a description of the robber, which Ritchie broadcast. When he learned that a subject had been stopped, Ritchie had Hoang and customer Jose Valle taken separately to view

2

the suspect. Later, Ritchie checked the serial numbers of the United States currency recovered from [petitioner] and found that all of the bait money matched the serial numbers on the bait money list. Later, in 2000, Ritchie received a property list regarding the robbery. After doing a computer check, he found information he believed showed that the case had been adjudicated. He therefore mistakenly marked on the property list he had been given that the property should either be returned to the victim or destroyed.

When Hayward police officer Jerry White heard the broadcast of the robbery at about 2:53 p.m., he activated the radio detection finder in his patrol car and received a directional signal for the transmitter hidden in the bait money, which he began to follow. The signal seemed to be coming from Library Park in Hayward, which is about two blocks from the bank. He broadcast this information and began to look for a man matching the suspect's description: African-American male, approximately 27 years old, short, with overbite, and with a black shirt on. White then saw [petitioner] walking towards a bus stop near the library. White detained the waiting buses; when other officers arrived, they detained [petitioner]. An officer arrived with a hand-held radio detector, and once they found that the transmitter was not on [petitioner], they started searching the park. They found the transmitter by a retaining wall at the corner of the library.

Hayward Police Detective Stan Brandon responded to a broadcast that the tracking device was in the area of Library Park, and saw a person fitting the robber's description standing near a bus. The person was [petitioner], and Brandon contacted him. [Petitioner] produced his identification and said he had come from the library. Other officers set up a perimeter in the area and checked the buses and nearby area for other possible suspects. Another officer, Tom Rodriguez, pat-searched [petitioner] and found a large bundle of folded money in one of his pockets. [Petitioner] said: "I just got paid today. I have a check stub for the money." [Petitioner] was also carrying a large bag, which the officers looked into. They saw a newspaper, a light-colored sport fishing hat, more U.S. currency inside the hat, a bottle of shampoo, and a check stub. The check stub was from an auto parts store and it was for less money than [petitioner] had on him. Brandon noticed that [petitioner's] black shirt appeared to have white writing on the inside. He asked [petitioner] to turn up his shirt, which revealed a white logo and lettering on the front of the shirt.

After the officers handcuffed [petitioner], they requested that the bank bring witnesses to the scene to view him. At about 3:03 p.m., Paulina Hoang was brought to the scene, and made a positive identification. About 10 minutes later, Jose Valle also identified [petitioner] as the man he had seen in the bank passing a note to Hoang.

Hayward Police Officer Theodore Zona booked [petitioner] after his arrest. Zona found three bundles of one-dollar bills, totaling $25 each, inside [petitioner's] coat, for a total of $75. Another officer found $715 in new, crisp bills in [petitioner's] pants pocket, and a single older, crumpled dollar bill in another pocket.

3

Crime scene technician Laura Martin collected the evidence from the bank robbery. All of the $20 bills used as bait money during the robbery were in [petitioner's] possession when he was arrested. A bank employee informed Martin that the amount of money taken during the robbery was $1,248. In addition to the $75 and $716 found on [petitioner's] person, Officer Rodriquez gave Martin $458 (presumably from [petitioner's] bag). Aside from the one crumpled dollar bill taken from one pants pocket, the total amount of currency found in appellant's possession was $1,248.

[Petitioner] worked full-time for Speed Warehouse from January 2, 1997, until his termination on February 26, 1997, filling automotive part orders from the warehouse. [Petitioner] received a $200 cash advance on February 17, 1997, and a paycheck on February 20, 1997, for $217.72.

People v. Pettaway, No. A084426, slip op. at 2-7 (Cal. Ct. App. Jan. 28, 2003)

(footnote omitted) (Resp't Exh. 4).

## DISCUSSION

A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529

4

U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  Id.

B.      Claims

Petitioner raises two claims for relief under § 2254: (1) the prosecutor's use of peremptory challenges against four African-American jurors violated the Equal Protection Clause; and (2) the trial court's for cause removal of a prospective juror violated petitioner's Sixth and Fourteenth Amendment rights to a fair and impartial trial by jury, equal protection, and due process.

        1.      Peremptory Challenges

Petitioner, who is African-American, claims that the trial court erred in finding that the prosecutor had legitimate, non-discriminatory reasons for

5

exercising peremptory challenges as to four African-American jurors.  He argues

that the discriminatory use of peremptory challenges against these four

prospective jurors deprived him of his right to equal protection under Batson v.

Kentucky, 476 U.S. 79 (1986).

The Equal Protection Clause forbids the exclusion of jurors by peremptory

challenge solely on account of their race.  Batson, 476 U.S. at 89.  Batson permits

prompt rulings on objections to peremptory challenges under a three-step process.

First, the defendant must make a prima facie showing that the prosecutor has

exercised peremptory challenges on the basis of race.  Id. at 96-97.  That is, the

defendant must demonstrate that the facts and the circumstances of the case "raise

an inference" that the prosecution has excluded venire members from the petit jury

on account of their race.  Id. at 96.  If the defendant makes this showing, the burden

then shifts to the prosecutor to articulate a race-neutral explanation for striking the

jurors in question.  Id. at 97.  Finally, the court must determine whether the

defendant has carried his burden of proving purposeful discrimination.  Id. at 98.

To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and

determine whether there was intentional discrimination.  Lewis v. Lewis, 321 F.3d

824, 831 (9th Cir. 2003).

The record shows that the prosecutor exercised several peremptory

challenges.  At issue in this case are the prosecutor's challenges to four

prospective African-American jurors – Naomi B., Joan F., Beverly L., and

Lawrence B.  Petitioner made a "Batson/Wheeler"[1] motion after the prosecutor

exercised a peremptory challenge to Naomi B.  Although the trial court did not find

that the petitioner had made a prima facie case of discrimination, the prosecutor

stated her reasons for the peremptory challenge at that time.  In addition, after the

---

[1] In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion. See People v. Wheeler, 22 Cal. 3d 258, 280 (1978).  After Batson, these motions are sometimes referred to as "Batson/Wheeler" motions.

petitioner's second and third "Batson/Wheeler" motions, the court did find that a prima facie case had been made with respect to race.  The court then called upon the prosecution to offer an explanation for the exercise of the challenges.  After the prosecutor stated her reasons for excusing both Naomi B. and Joan F., the court denied petitioner's motion.  The petitioner also made "Batson/Wheeler" motions after the prosecution's peremptory challenges of Beverly L. and Lawrence B.  In each case, the court denied petitioner's motion after the prosecutor stated her reasons for exercising the peremptory challenges.

As he unsuccessfully did on appeal, petitioner now challenges the prosecutor's exercise of peremptory challenges as to these four jurors.

a.      Joan F.

The California Court of Appeal summarized the juror's voir dire and the prosecutor's reasons for excusing this juror as follows:

> Joan F. is a deeply religious woman, whose husband is a minister with both a church ministry and a prison ministry. Joan F. is very active in her church, and she and her husband show love and kindness to other people every day. Until recently, a Christian "brother" had been staying with Joan F. and her husband while he went through rehabilitation for cocaine addiction. When the prosecutor asked why she left blank the question in the jury questionnaire regarding whether she has any religious or other beliefs that would make it difficult to sit in judgment of another person, Joan F. responded that she "was going to come back and answer that. I had to think about that. But, no, I don't, it's all right."

> When asked why she previously had wanted to become a correctional officer, as she had stated in her questionnaire, Joan F. responded: "Oh, well, I'm a people person, whether people are good or bad, I just--the thought of me being who I am and they're incarcerated and just everybody that is locked up is not, I don't believe is guilty, okay, but they're still people and still humans and you know." Joan F. said that she would be able to follow the law and vote guilty if the prosecutor proved the case against [petitioner] beyond a reasonable doubt.

> When later asked to give her reasons for challenging Joan F., the prosecutor stated: "She was the woman who is very, very involved in her church group and I--and her husband had the prison ministry and she explained--I wish we would have put this on the record right after she talked but I think the record will speak for itself when reviewed on appeal.

> "She had a very forgiving attitude toward people. She

7

described herself as a people person. She had just taken someone
into her house from her church that she was ministering to and I felt
that she was--her life in her church and her husband's--I think her
husband didn't want her to be a correctional officer.

"Anyway, I did not feel that she would be someone when push
came to shove and it came time to make a decision to convict, she
definitely would not be comfortable doing that because her whole
life is dedicated to her religious beliefs and her husband is involved
in the prison ministry so that fact alone is enough for me to doubt
whether she might ultimately be able to convict and particularly
convict an African-American, because that seems to be the focus of
her prison ministry or the ministry that she is involved in."

People v. Pettaway, slip op. at 8-9.  The trial court then accepted the prosecutor's

explanation as legitimate and denied the defendant's motion.

The California Court of Appeal rejected petitioner's Batson claim as to

juror Joan F. on the ground that there was substantial evidence to support the trial

court's ruling that the prosecutor challenged the juror for race-neutral reasons.

Although the court noted that the prosecutor's "gratuitous" comment about Joan

F.'s possible inability to convict an African-American defendant was "unjustified

and inappropriate," it proceeded to conduct a "mixed motive" analysis and

concluded that the "prosecutor's stated reasons for excusing Joan F. . . . were

plausible and supported by the record, and not merely a surrogate for racial

stereotypes."  People v. Pettaway, slip op. at 9.  The court acknowledged that the

prosecutor's gratuitous comment "suggests that there could have been a racial

aspect to the prosecutor's attitude toward her," but discounted this possibility on

the grounds that Joan F. showed an uncertainty about sitting in judgment of others,

stated a belief that people in prisons are not guilty, and took into her home a man

trying to recover from cocaine addiction.  Id. at 10.  Because the prosecutor's

stated reasons for the challenge demonstrated that she wanted to excuse Joan F. for

race-neutral reasons, the court concluded that a racial reason was not "a meaningful

factor in the prosecutor's decision to exclude Joan F."  Id.

The California Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law.  Nor was the court's conclusion an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  The prosecutor's expressed concerns about the hesitancy of a person active in church and closely tied to a prisoner ministry to sit in judgment are a legitimate race-neutral justification for the exercise of a peremptory challenge.  See United States v. Brown, 352 F.3d 654, 669-70 (2nd Cir. 2003).  Furthermore, when a prosecutor tenders both discriminatory and nondiscriminatory reasons for challenging a venire member, as was the case here, a state court's undertaking of an analysis of both the discriminatory and nondiscriminatory reasons for the challenge, i.e., a "mixed motive" analysis, is not contrary to or a clear misapplication of Batson.  See Howard v. Senkowski, 986 F.2d 24, 30 (2d Cir. 1993) ("dual motivation" analysis applies to a Batson challenge); See also Gattis v. Snyder, 278 F.3d 222, 232-35 (3d Cir. 2002) (upholding mixed motive analysis of Delaware state court); United States v. Tokars, 95 F.3d 1520, 1531-34 (11th Cir. 1996) (upholding district court's mixed motive analysis on direct appeal); United States v. Darden, 70 F.3d 1507, 1530-32 (8th Cir. 1995) (upholding mixed motive analysis on direct appeal).  In the present case, the state court's conclusion that the prosecutor was motivated by race-neutral reasons is reasonable and supported by the record.  The records shows that Joan F. exhibited hesitancy about sitting in judgment of others, stated a belief that people in prisons are not always guilty, and that she was very forgiving as evidenced by the fact that she took into her home a man trying to recover from cocaine addiction.

Under the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), a state court's findings on the issue of discriminatory intent are presumed correct unless the petitioner rebuts the presumption by clear and convincing evidence.  Miller-El v. Dretke, 125 S. Ct. 2317, 2325 ( 2005) (citing 28 U.S.C. § 2254(e)(1)).  The petitioner must show the state court's conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Id. (citing 28 U.S.C. § 2254(d)(2)).

Petitioner's evidence does not overcome the presumption of correctness. Petitioner offers a jury comparison as evidence that the prosecutor's challenge of Joan F. was racially motivated.[2]  Petitioner compares Joan F. to Juror Number 3 and Juror Number 4.  Petitioner asserts that Juror Number 3 was an equally religious white woman who was involved in her church.  Juror Number 4 was another white woman involved in her church, had a daughter who was a minister and a son who wanted to be a missionary, and who had been visiting a friend in prison.

Petitioner's jury comparison does not present sufficient evidence to overcome the presumption of correctness.  Although the other jurors were involved in church and Juror Number 4 visited a prisoner, there is no evidence that these jurors were closely tied to a prisoner ministry or were so forgiving as to have invited a person with a cocaine addiction into their home.  Nor is there evidence that either Juror Number 3 or Juror Number 4 left blank the question in the jury questionnaire regarding whether they had any religious or other beliefs that

_____

[2]  Supreme Court precedent does not require courts to engage in comparative juror analysis for the first time on appeal.  Boyd v. Newland,  393 F.3d 1008, 1015 (9th Cir. 2004).  However, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."  Miller-El v. Dretke, 125 S. Ct. at 2325 ( 2005). Therefore, this court will consider petitioner's jury comparison as evidence in determining whether petitioner rebuts the presumption of correctness by clear and convincing evidence.

would make it difficult to sit in judgment of another person, or stated during voir dire that they did not believe that everybody that is locked up is guilty.  There are valid non-discriminatory reasons why the prosecutor would choose to strike Joan F. and not Juror Number 3 or Juror Number 4.

Petitioner is not entitled to federal habeas relief on this claim.  The court is satisfied that the California Court of Appeal's determination that the prosecutor was genuinely motivated by race neutral reasons she articulated for striking Joan F. was not objectively unreasonable.  Furthermore, a comparative analysis does not significantly undermine the reasonableness of the prosecutor's proffered justifications, such that it calls into question the genuineness of her motive.  See 28 U.S.C. § 2254(e)(1).

        b.    Naomi B.

The California Court of Appeal summarized the juror's voir dire and the prosecutor's reasons for excusing this juror as follows:

> Naomi B. works waiting on customers at a K.F.C. restaurant. She has a fifth grade education. She likes to read and write. She writes letters or after she reads a book, "I'll just write some of the things out." When asked what kind of books she reads, she answered: "Just any book." When defense counsel again asked: "Well, what kind, mysteries?" Naomi B. said: "Not mysteries, just regular books, any book, I can just pick up and--"

> Although the trial court initially did not find a prima facie case with respect to Naomi B., the prosecutor gave the following reasons for challenging her: "The primary reason for bumping her as I'm sure is obvious to everyone is that she is essentially illiterate. And she may say she enjoys reading and writing, however, the manner in which she filled out the questionnaire seems to weigh against that. She left almost every question unanswered and, even the questions she answered, she didn't answer fully. She didn't put where she works and it took a little while for her to explain where she works.

> "I believe that in a case--well, any criminal case in which I have been involved and I have been a juror on two cases, I believe it's very important for the jurors to be able to read the jury instructions for themselves in the jury room. And it's been my personal experience as a juror twice on criminal cases in San Francisco, that

1    the jurors did read the jury instructions again to themselves in the
     jury room and I would want each and every juror to have at least a
2    minimal level of reading comprehension to be able to do that.

3         "I don't think that Ms. B[.] evidenced that. And one of the final
     reasons is that when we were asking her the questions orally to try
4    and get a little more information out of her, that is myself and also
     when Ms. Browne [defense counsel] spoke with her, she looked
5    down and really didn't look up and meet our questioning with eye
     contact.

6         "And it was for those reasons that made me uncomfortable
     leaving her on the jury."

7    People v. Pettaway, slip op. at 11-12.  The trial court accepted the prosecutor's

8    explanation as legitimate and denied the defendant's motion.

9
          The California Court of Appeal rejected petitioner's Batson claim as to
10
     juror Naomi B.  The court examined Naomi B.'s juror questionnaire and noted that
11
     she had left several questions blank.  In addition, the court stated that the record of
12
     voir dire plainly indicated that both the trial court and counsel had trouble getting
13
     Naomi B. to fully answer their questions.  As an example, the court noted that the
14
     trial court had to ask three follow-up questions before determining that Naomi B.
15
     worked at a K.F.C. restaurant.  Finally, the court noted that defense counsel could
16
     not get Naomi B. to explain what kind of books she read.  The court concluded:
17

18        The record thus shows that the prosecutor was not unreasonable in
     expressing concern about Naomi B.'s literacy and ability to fully
19   follow the proceedings.  This, coupled with the prosecutor's
     observations that Naomi B. failed to look up or make eye contact
20   during questioning by both attorneys, rebuts any showing of
     purposeful discrimination.
21

22   People v. Pettaway, slip op. at 12-13.
23
          The California Court of Appeal's decision was not contrary to, or an
24
     unreasonable application of, clearly established federal law.  Nor was the court's
25
     conclusion an unreasonable determination of the facts in light of the evidence
26
     presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  A prosecutor's
27

28
                                        12

concern for a juror's ability to understand and follow the proceedings is a proper basis for a challenge.  See People v. Turner, 8 Cal. 4th 137, 169 (1994).  In the present case, the state court's conclusion that the prosecutor was motivated by race-neutral reasons is reasonable and supported by the record.  The record shows that Naomi B. left several questions in her juror questionnaire blank, had trouble fully answering questions, and could not explain what kind of books she read.  The record also shows that during further questioning Naomi B. looked down and avoided eye contact.

Petitioner offers a jury comparison as evidence that the prosecutor's challenge of Naomi B. was racially motivated.  Petitioner asserts that Naomi B.'s juror questionnaire was no less complete than that of Juror Number 5.  But regardless of whether Juror Number 5 also checked "yes" or "no" to virtually every question as petitioner asserts, there is no evidence that Juror Number 5 had difficulty communicating during jury voir dire.  Nor is there evidence that the trial court needed to ask Juror Number 5 multiple follow-up questions before determining Juror Number 5's place of work, or that Juror Number 5 was not able to answer a simple question about what kind of books he or she read--or some other similar simple question.  There are valid non-discriminatory reasons why the prosecutor would choose to strike Naomi B. and not Juror Number 5.

Petitioner is not entitled to federal habeas relief on this claim.  The court is satisfied that the California Court of Appeal's determination that the prosecutor was genuinely motivated by race neutral reasons she articulated for striking Naomi B. was not objectively unreasonable.  Furthermore, a comparative analysis does not significantly undermine the reasonableness of the prosecutor's proffered

justifications, such that it calls into question the genuineness of her motive.  See 28 U.S.C. § 2254(e)(1).

   c. Beverly L.

The California Court of Appeal summarized the juror's voir dire and the prosecutor's reasons for excusing this juror as follows:

> Beverly L. is actively involved in her church.  Her father is a pastor, though she does not attend his church, and she reads the Bible in her spare time. When the prosecutor asked if she felt that her involvement gives her more of a forgiving attitude toward other people, she answered: "That is what we're taught but yet still we're humans and we have [to] make judgments based upon what we know is the right thing." She answered in the negative when the prosecutor asked whether, if the prosecution proved its case beyond a reasonable doubt and according to the judge's instructions, "would there be any hesitancy on your part to be able to vote guilty?" However, when the prosecutor observed that she had paused before saying "no," Beverly L. responded: "Well, I don't make hasty decisions, plus I'm nervous, so I want to be able to say the right thing."

> Beverly L. had been married for five years to a man who was arrested three times during their marriage, once for drugs, and twice for violating probation. She left him after the third arrest. She never knew all of the details of the arrests, even though she went to his court appearances and talked to his lawyer. She still asks herself why: "Why didn't I see the signs? Why didn't I try to get more information? Maybe I didn't get more information because I was afraid that more things would be uncovered.  The less I knew, the better I could deal with it.

> When asked to give her reasons for challenging Beverly L., the prosecutor stated: "As the court knows, based on my questions of any juror who feels they are heavily involved with church or have a background in psychology or elementary school teachers or preschool teachers, I am very worried about people who might show too forgiving an attitude and might hold me to a higher burden of proof.

> "And, throughout Ms. L[.'s] questionnaire, she showed that she had an involvement with her church and, more importantly, it was her questioning about her forgiving her husband and I think some level of denial. But she has, I believe, a high ability to rationalize, deny and forgive.

> "And, for that reason, I didn't want to get to the end of a four-week trial and have her be indecisive. She was a quiet, mild-mannered-type person. So that was a reason for excusing her."

> Defense counsel responded: "There is nothing further from

14

the truth that Ms. L [.] was a quiet, mild person. Ms. L[.] got into my face when I asked her whether she was attending her father's church. She made it quite clear that she walked out on her husband after he was involved in drugs and two probation violations. And she made it quite clear that she didn't have a clue why she had bothered to go see him in San Bruno [jail] the one time that she did.

"So the district attorney can put on the record what she wants to say. She was mild-mannered or to say she was forgiving. But the record makes it very, very clear that there was a very judgmental, very strong person who took no grief from anyone and who was demanding that people be responsible for their behavior. She exercised that against her husband. She doesn't attend her father's church, even though she is strongly religious, even though it's the same denomination, even though it's local."

The prosecutor then responded: "Her forgiveness of this husband occurred over a five-year period. He was arrested three different times, yet she remained ignorant of the details of those arrests and she explained that even when she went and talked to the public defender, she still didn't understand the reasons for those arrests."

People v. Pettaway, slip op. at 13-15 (footnote omitted). The trial court denied the defendant's motion stating "[t]he rationale stated by the district attorney satisfied the court that they were non-racially made." Id. at 15.

The California Court of Appeal rejected petitioner's Batson claim as to juror Beverly L. on the grounds that the record supported the prosecutor's non-discriminatory reasons for challenging Beverly L. The court noted that Beverly L. acknowledged a high degree of church involvement, and that the prosecutor's concern that Beverly L. showed a "high ability to rationalize, deny, and forgive" with regard to her ex-husband arrests was supported by the record. Beverly L. knew little about the nature of the arrests or their outcomes, and even admitted to being in denial about his problems. The court concluded that "the prosecutor thus provided valid, race-neutral reasons for challenging Beverly L." Pettaway, slip op. at 15.

The California Court of Appeal's decision was not contrary to, or an

15

unreasonable application of, clearly established federal law. Nor was the court's

conclusion an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  The

prosecutor's expressed concerns about a juror being too forgiving or unable to sit

in judgment are legitimate race-neutral justifications for a prosecutor's exercise

of a peremptory challenge.  See United States v. Brown, 352 F.3d 654, 669-70 (2nd

Cir. 2003).  In the present case, the state court's conclusion that the prosecutor

was motivated by race-neutral reasons is reasonable and supported by the record.

The record shows that Beverly L. acknowledged a high degree of church

involvement, showed a "high ability to rationalize, deny, and forgive" with regard to

her ex-husband arrests, and even admitted to being in denial about her ex-husband's

problems.

Petitioner offers a jury comparison as evidence that the prosecutor's

challenge of Beverly L. was racially motivated.  Petitioner compares Beverly L. to

Juror Number 3 and Juror Number 4.  Petitioner asserts that Juror Number 3 and

Juror Number 4 were similarly situated but received disparate treatment as

compared to  Beverly L.  Petitioner's jury comparison does not present sufficient

evidence to overcome the presumption of correctness.  Although both Juror

Number 3 and Juror Number 4 were involved in church, there is no evidence that

these jurors lived with anyone over a five-year period who was arrested multiple

times without becoming aware of the nature of the arrests or their outcomes.  Nor

is there evidence that either Juror Number 3 or Juror Number 4 displayed in their

personal background the same ability to "rationalize, deny, and forgive" that

Beverly L. displayed, or that either Juror Number 3 or Juror Number 4 hesitated

when asked if they would be able to vote guilty.  There are valid non-discriminatory reasons why the prosecutor would choose to strike Beverly L. and not Juror Number 3 or Juror Number 4.

Petitioner is not entitled to federal habeas relief on this claim.  The court is satisfied that the California Court of Appeal's determination that the prosecutor was genuinely motivated by race neutral reasons she articulated for striking Beverly L. was not objectively unreasonable.  Furthermore, a comparative analysis does not significantly undermine the reasonableness of the prosecutor's proffered justifications, such that it calls into question the genuineness of her motive.  <u>See</u> 28 U.S.C. § 2254(e)(1).

d.    <u>Lawrence B.</u>

The California Court of Appeal summarized the juror's voir dire and the prosecutor's reasons for excusing this juror as follows:

> Lawrence B. is 25 years old, having graduated from college in 1999. He is a management trainee at a car rental agency. His father is the city manager of Oakland. He has had both positive and negative experiences with police officers, and wrote on his questionnaire, in explaining his affirmative response to the question whether he had ever been discriminated against because of race: "I don't want to seem like a martyr, but honestly there are too many to name." He explained on voir dire that the discrimination mostly involved profiling, usually being followed around in his car and once being pulled over. Lawrence B. did not believe his experiences would affect his ability to be fair.
>
> When asked to give her reasons for challenging Lawrence B., the prosecutor said: "[A]fter Ms. Browne [defense counsel] wanted Mr. W[.] excused for cause and that was granted, I had to look for someone who I might consider to be a wise leader, so I have exercised many challenges to get to people deeper in the panel who could really fill Mr. W[.'s] shoes on the jury. And, as part of that effort, I wanted to get rid of the 20-year-olds and we have successfully done that now.  I don't believe there are any other--no, we have a more mature, more sophisticated jury group sitting.  Mr. B[.] was one of the last young people.
>
> "There were several things. The most important thing I'll get to last.

"But Mr. B[.] has not smiled really much since he has been seated. He has been very stiff. He answered both counsel's questions very stiffly and in situations where everybody else has either laughed or smiled, where something [humorous] has gone over the last day and a half, end even if it's Ms. Browne making a joke and everyone laughs, he still does not smile and has remained very stiff.

"But the most important thing is the deputy who came in--so I have been watching him as well as the other jurors to see how well they start interacting and that never started happening with him.

"The final two factors and most important one to my mind is the deputy sheriff who was in here yesterday came up to me and indicated, pointed to Mr. B[.] and said that guy was just downstairs and had a real attitude coming through the metal detector. He does not like law enforcement and here he is sitting on your jury. So you have to take that into account.

"And, finally, the fact that he is the son of a prominent person is something that I keep in the back of my mind. I sat as a juror as I said twice before in San Francisco and one of my experiences there was that the daughter of Dianne Feinstein was on the same panel that I was on and I believe that was in 1991. And when that was pointed out to everybody, and I'm not saying that had started to happen in this case, but when ... it was brought to everyone's attention, they treated her with a lot more deference and it sort of made her stand out to the other people.

"And I don't like media in the courtroom, I don't like anything that makes a particular witness or a juror an unusual person. I want a cohesive jury and a smooth presentation.

"So for all of those combined factors, but most specially, what the deputy told me about the attitude at the metal detector, which is something we would never see in the courtroom exactly, I exercise that challenge."

People v. Pettaway, slip op. at 15-17 (footnote omitted).  The trial court denied the

defendant's motion stating "once again, I sort of will stretch my discretion but I

think it is sufficient reason to deny the Wheeler motion." Id. at 17.

The California Court of Appeal rejected petitioner's Batson claim as to

juror Lawrence B.  The court did not consider the deputy sheriff's comment about

Lawrence B.'s attitude because it is vague and it occurred outside the courtroom

where neither counsel nor the court could see it.  However, the court did note that

Lawrence B. was 25 years old, had graduated from college a year previously, was in

a management training program, and "clearly had had only limited life experiences

at that point, and the fact that he was no longer in college does not, as [petitioner]

18

argues, prove that the prosecutor's reason was pretextual." Pettaway, slip op. at 18.

The court further noted that neither the trial court nor defense counsel

contradicted the prosecutor's characterization of Lawrence B.'s body language.

The court concluded that "these observations by the prosecutor constituted a valid

reason for a peremptory challenge, and [petitioner] has not shown that this reason

was pretextual." Id. (The court also noted that Lawrence B.'s father was "a local

public figure whose name appears regularly in the media." Id.)

     The California Court of Appeal's decision was not contrary to, or an

unreasonable application of, clearly established Federal law.  Nor was the court's

conclusion an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  Young people

are not a cognizable group for Batson/Wheeler purposes.  See People v.

Henderson, 225 Cal.App.3d 1129, 1153 (1990).  A prosecutor's concern about

having young people lacking life experience on a jury is a legitimate, non-racial

justification for using peremptory challenges.  See United States v. Pichay, 986

F.2d 1259 (9th Cir. 1993).  Petitioner argues that youth must be tied to a lack of

experience in the world.  However, the record shows that Lawrence B. "clearly had

had only limited life experiences at that point."  Likewise, the prosecutor's

concern regarding Lawrence B.'s body language is a valid reason for using a

challenge.  See Burks v. Borg, 27 F.3d 1424 (9th Cir. 1994); People v. Turner, 8

Cal. 4th 137, 171 (1994).  Petitioner argues that resort to "body language" is a

"safe haven" to justify a discriminatory peremptory challenge because the appellate

court is helpless to evaluate the claim on a cold record.  However, neither the trial

court nor defense counsel contradicted the prosecutor's characterization of

Lawrence B.'s body language.  Finally, petitioner argues that Lawrence B.'s "celebrity-by-proxy is a makeweight excuse."  However, the record indicates that Lawrence B.'s father was a local figure whose name appeared regularly in the media.  The state court's conclusion that the prosecutor was motivated by race-neutral reasons is reasonable and supported by the record.

Petitioner is not entitled to federal habeas relief on this claim.  The court is satisfied that the California Court of Appeal's determination that the prosecutor was genuinely motivated by race neutral reasons she articulated for striking Lawrence B. was not objectively unreasonable.  See 28 U.S.C. § 2254(d).

2.    For Cause Challenge

Petitioner claims that the trial court's for cause removal of a prospective juror violated petitioner's Sixth and Fourteenth Amendment rights to a fair and impartial trial by jury composed of representatives of a fair cross-section of the community, equal protection, and due process.  Petitioner bases this claim on an assertion that the trial court improperly granted the prosecutor's challenge for cause to a prospective juror who failed to disclose prior criminal history on his questionnaire and in his voir dire.

A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair and impartial jury pool composed of a cross section of the community.  See Holland v. Illinois, 493 U.S. 474, 476 (1990); Taylor v. Louisiana, 419 U.S. 522, 538 (1975); Duncan v. Louisiana, 391 U.S. 145, 148-58 (1968).  The fair cross-section requirement applies only to the larger jury pool or venire and is not applicable to petit juries.  See Lockhart v. McCree, 476 U.S. 162, 173-74 (1986); Nevius v. Sumner, 852 F.2d 463, 463 (9th Cir. 1988).  Although

the Sixth Amendment guarantees that the petit jury will be selected from a pool of names representing a cross-section of the community, it does not require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.  See Taylor, 419 U.S. at 538; Lockhart, 476 U.S. at 173; see also Harris v. Pulley, 852 F.2d 1546 (9th Cir. 1988) (fair cross-section requirement does not apply to petit juries).

In Duren v. Missouri, 439 U.S. 357 (1979), the Supreme Court held that to establish a prima facie violation of the fair cross-section requirement, a defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community, (2) the group was not fairly represented in the venire from which the petit jury was chosen, and (3) the underrepresentation resulted from a systematic exclusion of the group in the jury selection process.

In the present case, petitioner has provided no evidence whatsoever showing that African Americans were not fairly represented in the venire from which the petit jury was chosen.  Nor does the record show any violation of petitioner's due process or equal protection rights.

The California Court of Appeal rejected petitioner's claim on the grounds that the trial court's decision to excuse James B. for cause based on juror concealment was supported by the record and was not an abuse of discretion. Specifically, the court reasoned:

> "The qualification of a juror challenged for cause is a matter within the discretion of the trial court and is seldom a ground for reversal on appeal." (People v. Morris, (1991) 53 Cal.3d 152, 183.) When a prospective juror withholds information regarding his or her criminal history, a trial court is justified in excusing the juror for cause. In People v. Morris, supra, 53 Cal.3d at pages 183-184, our Supreme Court found a prospective juror's excusal for cause warranted, explaining: "In view of [the prospective juror's] rap sheet,

his responses to questions about his arrest record were lacking in candor and completeness. Concealment by a potential juror constitutes implied bias justifying disqualification."

Here, the trial court's decision to excuse James B. for cause was based on the following. First, James B. failed to mention several police contacts and arrests (detained and handcuffed 6 or 7 times, arrested and jailed for robbery, and arrested for a second DUI), and at least one conviction (§ 12500--driving without a license), on his questionnaire. Second, during voir dire, he acknowledged the detentions and the robbery arrest, but did not acknowledge a second DUI arrest and claimed he did not remember being convicted of driving without a license. The trial court found that the various omissions on the questionnaire and especially the acknowledgement on voir dire of only two of at least four arrests were not negligent omissions.

[Petitioner] avers that the prosecutor did not "prove" that James B. had a second DUI arrest. However, in light of the prosecutor's and trial court's discussion of that arrest showing up on his rap sheet and defense counsel's failure to dispute its presence there, [petitioner's] claim is not persuasive. [Petitioner] also argues that James B. may have considered the section 12500 violation a minor traffic citation rather than an arrest and conviction and that he may not have believed he was arrested for a DUI "due to the bogus nature of the arrest." This speculation on [petitioner's] part does not undermine the trial court's reasonable conclusions that James B. was not being forthright about his criminal history.

The trial court's decision to excuse James B. for cause is supported by the record and was not an abuse of discretion. (See People v. Morris, supra, 53 Cal.3d at p. 183.)

People v. Pettaway, slip op. at 22-23.

"Concealment by a potential juror constitutes implied bias justifying disqualification." People v. Morris, 53 Cal. 3d 152, 183-84 (1991). A state trial court's determination of the partiality of a prospective juror is a question of fact that is entitled to a presumption of correctness in a federal habeas proceeding. Patton v. Yount, 467 U.S. 1025, 1036-38. (1984). In the present case, the record supports the trial court's finding of concealment. James B. reported on his questionnaire that he had been accused of a crime once. In addition, when asked about his times in a courtroom, he only reported on his questionnaire that he had been to court for traffic citations. In light of his multiple arrests, his conviction for violating California Vehicle Code § 12500,

and his being detained and handcuffed by police several 6 or 7 times, James B. was clearly not being forthcoming in his questionnaire. Furthermore, when asked about visiting jail or being incarcerated, James B. responded in his questionnaire that he spent a night in Santa Rita for a DUI/Suspended license. However, during voir dire James B. revealed that he was arrested for robbery and spent 3 to 4 days in jail. James B. never acknowledged in his questionnaire or during jury voir dire a second DUI arrest and the Vehicle Code § 12500 conviction. The trial court concluded that a challenge for cause was appropriate because of concealment by the juror. The court felt the omitted information involved "things that people would not forget." The state court's conclusion was not objectively unreasonable. See 28 U.S.C. § 2254(d).

Petitioner is not entitled to relief. Petitioner has not provided evidence to overcome the presumption of correctness entitled to the state trial court's determination. And in any event, the claim is without merit. Even if petitioner were to demonstrate that it was error for the trial court to remove the juror for cause, he must also show prejudice. See People v. Mickey, 54 Cal.3d 612, 684 (1991) ("an erroneous ruling on a 'for cause' challenge is not automatically reversible but subject to scrutiny for prejudice under harmless-error analysis"). He does not. Petitioner simply asserts that not removing James B. for cause would have caused the prosecutor to use peremptory challenges on James B. and, then, petitioner would have been able to challenge the use of that peremptory challenge with a "Batson/Wheeler" motion. Such pure speculation cannot suffice.

**CONCLUSION**

1         For the foregoing reasons, the petition for a writ of habeas corpus is

2    DENIED.

3    ///

4    ///

5    ///

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.


DATED:  December 01, 2005

CHARLES R. BREYER
United States District Judge

G:\CRBALL\2004\2708\Order.wpd